UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION


ANTHONY WAYNE CORPORATION, )
                                )
            Plaintiff,          )
                                )
        vs.                     )      CAUSE NO. 3:13CV1406-PPS
                                )
ELCO FASTENING SYSTEMS, LLC,    )
ELCO INDUSTRIES, INC.,          )
ELCO TEXTRON, INC.,             )
TINNERMAN PALNUT, INC., and     )
A. RAYMOND TINNERMAN            )
 MANUFACTURING, INC.,           )
                                )
            Defendants.         )


## OPINION AND ORDER

Plaintiff Anthony Wayne Corporation (AWC) owns property in Logansport,

Indiana which it has leased over the years to a series of manufacturing companies.

Since 1972, the series of lessees (in chronological order) has included defendants Elco

Industries, Inc., Elco Textron, Inc., Tinnerman Palnut, Inc. and, most recently, A.

Raymond Tinnerman Manufacturing, Inc.  AWC has pretty much been an absentee

landlord; a representative from the company has been to the property precisely once in

the last 30 years.  AWC brought this case after learning that the property's soil and

groundwater are contaminated, requiring environmental cleanup, and that the building

on the property is in a deteriorated condition with repairs estimated in excess of

$660,000.

The third amended complaint asserts environmental claims under Indiana law and CERCLA, as well as claims for breach of the lease, waste, and nullification of Elco Fastening Systems, LLC's certificate of cancellation under Delaware law. Now before me are motions for summary judgment by the Elco defendants and A. Raymond Tinnerman Manufacturing.[1] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The following facts are undisputed. The Logansport property consists of a one-story industrial building of approximately 23,000 square feet. [DE 93-6 at 2.] The Plaintiff AWC bought the Logansport property in 1972 from K.L.K. Manufacturing, but leased the warehouse back to K.L.K. for its continued manufacturing operations. Later that year, Elco Industries took an assignment of K.L.K.'s interest in the lease. [DE 48-1.] Elco Industries used the property for metal plating operations for more than 20 years. In 1995, Elco shifted its use of the property strictly for storage, as a warehouse for raw material, and negotiated a reduction in the rent that was formalized in the execution of a new lease between AWC and Elco on May 1, 1995. [DE 48-3.] AWC commissioned an appraisal of the property in 2001. The appraisal report noted that the building was in

---

[1] The only other defendant named in the suit is Tinnerman Palnut, Inc. The court file contains no proof of service on Tinnerman Palnut, and no appearance on its behalf. In A. Raymond Tinnerman's Notice of Removal, it is suggested that Tinnerman Palnut "was a Delaware corporation" but "became inactive as of March 14, 2013, and no longer exists." [DE 2 at ¶3(b).]

"at best fair condition," had boarded-up windows, and was "in the disintegration stage of transition." [DE 87-13 at 4, 5, 6.]

By 2005, Elco Textron was the lessee under the 1995 Lease. In October of 2005, Elco Textron assigned its rights in the lease to Tinnerman Palnut. [DE 48-5.] A. Raymond Tinnerman's (ART) occupancy of the property began four years later in 2009. A "Consent of Landlord" was executed by AWC's Vice President Frank Silva on October 19, 2009, approving Tinnerman Palnut's assignment of the leasehold to ART. [DE 31-7.] AWC did not inspect the property at that time. In fact, as I mentioned at the outset, other than the 2001 appraisal AWC commissioned, the only inspection of the property from 1972 to 2013 by AWC occurred once in the mid-1990's when Thomas Silva, then President of AWC, visited and confirmed that the building was being used only as a warehouse for storage, and not for any manufacturing processes. [DE 87-4 at 4, 5.]

A document executed by AWC and Tinnerman Palnut on April 11, 2006 extended the 1995 Lease to April 30, 2010. [DE 48-6 at 2.] A further lease extension to April 30, 2014 was prepared for AWC and ART, but was never executed. [DE 48-8 at 2.] AWC offers that it made efforts to get the lease extension signed after ART took over the property, but discontinued the effort once ART had made three months of lease payments. [DE 94 at 3.] As a result, AWC readily admits that "it does not have a signed lease with A. Raymond Tinnerman." [DE 87-18 at 2.] ART vacated the property and returned the keys to AWC in February 2013.

Shortly before that, on January 18, 2013, AWC's President Frank Silva visited the property and was "appalled" by its condition, which included a collapsing, leaking roof. [DE 87-4 at 5 (p.36:3).] A subsequent building inspection disclosed significant damage to the roof and walls from water infiltration, a number of broken windows, and other needs for significant repair. [DE 94-4 at 3, 6.] The inspector ascribed the building's condition to neglect that furthered the deterioration. [DE 94-5 at 4 (19:15-18).]

**ELCO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**The Corporate Dissolution Issue – Count V**

There are three Elco defendants named in the third amended complaint. Count V of the complaint is labeled "Nullification of Certificate of Cancellation." In a moment I will describe what that means because there is nothing intuitive about it. But to get there one first needs to understand the corporate history of the three Elco defendants. In essence, they are the same company with different names. Here's the history: Elco Industries, Inc. was incorporated in Delaware on March 11, 1969. [DE 91-20 at 1.] It changed its name to Elco Textron Inc. on November 20, 1995. [DE 91-21 at 1-2.] On April 3, 2006, Elco Textron Inc. converted to a Delaware limited liability company and became Elco Fastening Systems LLC. [DE 91-22 at 1.] The LLC's certificate of cancellation was filed on May 31, 2012. [DE 91-25 at 1-2.]

Elco's first argument for summary judgment is that the cancellation of Elco Fastening Systems LLC under Delaware Law in 2012 rendered it impervious to this suit,

which was filed in 2013. If Elco properly wound up its corporate business in 2012, then any claim against them would be a nonstarter. Count V of the amended complaint — the one labeled "Nullification of Certificate of Cancellation" — is AWC's effort to avoid the effect of the corporate dissolution.

Fed.R.Civ.P. 17(b)(2) provides that a corporation's capacity to be sued is determined "by the law under which it was organized." Elco invokes §18-803(b) of Delaware's LLC Act:

> Upon dissolution of a limited liability company and until the filing of a certificate of cancellation as provided in § 18-203 of this title, the persons winding up the limited liability company's affairs may, in the name of, and for and on behalf of, the limited liability company, prosecute and defend suits, whether civil, criminal or administrative....

6 Del. Code §18-803(b). The ramifications of this provision include that "[a] limited liability company cannot be sued under Delaware law once the company's certificate of cancellation has been filed unless the plaintiff successfully seeks to have the company's certificate of cancellation nullified on the ground that the company was not 'wound up' in compliance with Delaware law." *Soroof Trading Development Co., Ltd. v. GE Fuel Cell Systems,* 842 F.Supp.2d 502, 520 (S.D.N.Y. 2012).

Like the plaintiff in *Soroof*, AWC seeks nullification of Elco's certificate of cancellation, contending in Count V that Elco "should have anticipated Anthony Wayne's claims" but, in violation of 6 Del. Code §18-804(b)(3), "failed to make reasonable provision to pay Anthony Wayne's claims." [DE 76 at ¶¶64, 65.] What §18-804(b)(3) requires is that a dissolving LLC:

make such provision as will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the limited liability company or that have not arisen but that, based on facts known to the limited liability company, are likely to arise or to become known to the limited liability company within 10 years after the date of dissolution.

This requirement is also subject to limitations "[i]f there are insufficient assets." §18-804(b). Elco argues both that it had no assets at the time of dissolution and that any liability to AWC was not foreseeable so as to trigger the set-aside provision. In *Soroof*, because it was undisputed that the LLC "had no assets available to pay potential claims at the time of dissolution" and was "obligated to make provision for claims only 'to the extent of assets available therefor,'" the LLC was entitled to summary judgment dismissing all the claims against it. *Soroof*, 842 F.Supp.2d at 520-21.

Here AWC offers the affidavit of John R. Clark, who is identified as the former Executive Vice President, General Counsel and Secretary of Elco Fastening LLC.[2] Clark attests that after Elco Textron sold its assets related to the property to Tinnerman Palnut on November 4, 2005, the company was converted into Elco Fastening Sytems LLC in April 2006, and between 2006 and 2010, "sold off its remaining assets." [DE 91-24 at ¶5.] Elco contends that "it is undisputed" that as of the filing of the certificate of cancellation, Elco Fastening "did not have any assets remaining" and therefore "had no

---

[2] Elco represents in its summary judgment memorandum that Clark held these positions with Elco Fastening. Clark's affidavit identifies his current position as Executive Vice President, General Counsel and Chief Administrative Officer of Fontana America Inc./Acument Global Technologies Inc. AWC raises no dispute about Clark's former positions with Elco or his first-hand knowledge of Elco's corporate history and asset disposition.

obligation to set aside funds for some future, potential claim by Anthony Wayne." [DE 90 at 24.]

AWC's response is to suggest that the disposition of Elco's assets was largely in the nature of redistribution to related companies, so that Elco was capable of setting aside assets for future claims. [DE 92 at 7.] But AWC cites no authority suggesting that an LLC only benefits from the protections of the statute if it goes involuntarily belly-up as opposed to reorganized out of business by its corporate family. The statutory references to the availability of assets make no distinctions as to where previous assets have gone or why, and provide no basis for conclusions about the relevance of "fraudulent transfers" or anything of that sort. Although "allowing entities to dissolve in order to avoid any contractual or other obligations would fly in the face of any rational public policy," that concern is addressed by the Delaware LLC Act's requirement of set-asides based on known facts giving rise to potential liability. *Novartis Corporation v. Webvention Holdings LLC*, 2015 WL 6669158 at *7 (D.Md. 2015). So Elco is correct that AWC is unable to dispute that Elco had no assets at the time of the filing of its certificate of cancellation on May 31, 2012.

The second element of AWC's contention about Elco's wrongful dissolution is also resolved in Elco's favor. Section 18-804(b)(2) required Elco to set aside available assets only if, based on facts known to Elco at the time of its dissolution, AWC's claims were likely to arise or become known within 10 years. The Act defines "knowledge" as "actual knowledge of a fact" rather than "constructive knowledge of the fact." 6 Del.

Code §18-101(5). AWC offers only a general and unpersuasive argument that its claims were "likely to arise," triggering the §18-804(b)(2) set-aside provision, because Elco knew that it had once used hazardous materials in its manufacturing activities at the site. [DE 92 at 8.] Especially when viewed against the undisputed historical facts, this reasoning is entirely too speculative, and could not reasonably support a conclusion that a set-aside was required.

In May 2012, Elco had been out of the property for seven years; it assigned the lease to Tinnerman Palnut in 2005. It had stopped manufacturing on the site in 1990, and used the property only as a warehouse from 1995 to 2005. During its long occupancy from 1972 to 2005, Elco received no indication that AWC had or would have any claims against Elco relating to its use of the property, even after AWC had an appraisal in 2001 that reflected the condition of the property. By the time Elco dissolved in 2012, seven years after vacating the property, no new facts were known to it that would have made it likely that AWC would assert any claims against Elco.

As a matter of law, I conclude based on the undisputed facts of record that AWC is unable to successfully challenge Elco's 2012 certificate of cancellation, and that AWC's claims against Elco asserted in 2013 are subject to summary judgment as result. Under Delaware law, "suit generally may be brought by or against a limited liability company only until the certificate of cancellation is filed." *Metro Communication Corp. BVI v. Advanced Mobilecomm Technologies Inc.*, 854 A.2d 121, 138 (Del.Ch. 2004). On this

basis, summary judgment will be granted to the Elco defendants on all five counts of the third amended complaint.

Elco makes additional arguments for summary judgment on Counts I through IV. For the sake of completeness I will address each of these arguments as well below.

**Environmental Claims – Counts I and II**

Count I of the third amended complaint is brought under Indiana's Environmental Legal Action statute, I.C. §13-30-9-3, and Count II is a claim for response costs under the federal Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §9607(a) – the so-called "CERCLA" statute. Both counts allege that Elco is liable to AWC for environmental clean-up costs because Elco "caused and/or contributed to the handling, storage, treatment, transportation, and/or disposal of hazardous substances" on the property. [DE 76 at ¶¶34, 38.] AWC's pleading sweeps with a broader brush than the Indiana statute, which applies only to one who caused or contributed to "the release" of a hazardous substance into the soil or groundwater. I.C. §13-30-9-2. Similarly, the potentially applicable provision of CERCLA, §9607(a)(2), refers to "disposal" of a hazardous substance. In addition to the LLC dissolution defense, Elco argues that it is entitled to summary judgment on both environmental claims because AWC "has no evidence that Elco caused or contributed to a release of hazardous substances at the Site." [DE 90 at 32.]

CERCLA liability requires "disposal" of a hazardous substance, which "'means the discharge, deposit, injection, dumping, spilling, leaking, or placing' of contaminants

into the surrounding environment." *Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 178 (2nd Cir. 2003). Direct evidence is not required, and liability under CERCLA "may be inferred from the totality of the circumstances." *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 885, 892 (10th Cir. 2000). Nonetheless, a CERCLA plaintiff must still "'demonstrate that it is probable that the defendants discharged hazardous material.'" *DVL, Inc. v. Niagara Mohawk Power Corp.*, 490 Fed.Appx. 378, 383 (2nd Cir. 2012), quoting *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 132 (2nd Cir. 2010).

Under the Indiana companion to CERCLA, the Environmental Legal Action statute, liability "requires proof that the defendant was in some way involved in the contamination of the property in question." *5200 Keystone Ltd. Realty, LLC v. Filmcraft Laboratories, Inc.*, 30 N.E.3d 5, 14 (Ind.Ct.App. 2015). Summary judgment for the tenant is appropriate where the plaintiff cannot present evidence linking the tenant "to the particular contaminants discovered to be present at the Site" and its evidence "did not establish that [the tenant] used products containing those contaminants in its operations." *Id.* at 16.

AWC response to summary judgment relies on inferences — one might say conjecture — rather than any direct evidence of Elco's operations actually involving, much less releasing, hazardous substances. AWC offers one report – the January 1983 "Briefing Memo" – addressing Elco's wastewater treatment. [DE 93-8.] The memo reflects that Elco's manufacturing operations generated wastewater used to cool degreasers. [*Id* at 2.] AWC's contention is that degreasers at that time often contained

TCE and TCA, two hazardous substances found in soil and sediment on the property, so that "[c]onsidering these facts in the light most favorable to Anthony Wayne and construing all inferences in Anthony Wayne's favor, it is likely that Elco used TCE and TCA in its operations." [DE 92 at 10.]

"Likely" is too strong a word for this entirely porous chain of reasoning, which is insufficient to show that Elco ever actually used TCE or TCA, particularly when Elco has evidence that it used a different solvent, MEK. [DE 91-7.] Even weaker is AWC's assertion that because metal finishing "can produce contaminants to the environment," it is likely that Elco's metal finishing operations did so. [DE 92 at 10.] AWC clearly lacks evidence sufficient to support more than a *possibility* that Elco released hazardous substances on the property. Elco is entitled to summary judgment on Counts I and II because AWC's sparse evidence and entirely speculative reasoning are insufficient to create an issue of material fact.[3]

### Breach of Lease – Count III and Waste – Count IV

In addition to the over-arching LLC dissolution argument, Elco urges additional grounds for summary judgment in its favor on AWC's state law claims for breach of the lease and for waste. Count III alleges that each of the defendants breached the lease by failing to keep the property in good repair and working order, and by releasing hazardous substances on the site. [DE 76 at ¶¶45, 46.] The claim is based on the

---

[3] With two bases supporting summary judgment in Elco's favor on the environmental claims, I will not address Elco's third argument, that AWC cannot prove that the presence of hazardous substances at the property poses a risk to human health and the environment.

condition of the property in January 2013, after ART vacated the premises. [*Id.* at ¶43.] I have already discussed AWC's inability to establish that Elco caused or contributed to the release of hazardous substances on the property. Similarly, AWC is unable to offer evidence as to Elco's role in the deterioration of and damage to the structure, given that Elco had vacated the property some 8 years earlier in 2005, when it assigned the lease to Tinnerman Palnut.

AWC responds that, in order to survive summary judgment, it "need only establish facts [from] which a reasonable fact finder could conclude that Elco or A. Raymond breached the applicable lease." [DE 92 at 17.] True enough, but AWC cannot establish facts that could reasonably support such a finding as to Elco. After acknowledging that the property was in fair condition as of the 2001 appraisal, AWC merely asserts that "sometime between 2001 and 2013, the Property became damaged and in unrentable condition." [*Id*. at 17-18.] Without any evidence that the property was in a damaged condition when Elco left in 2005, there is simply no rational basis for a conclusion that the damage occurred between 2001 and 2005. Elco is entitled to summary judgment on Count III.

These same reasons provide an additional ground for granting Elco's motion as to the waste claim in Count IV. Because AWC lacks evidence that Elco's conduct between 2001 and 2005 involved "destruction, misuse, alteration or neglect of the premises," its waste claim against Elco cannot succeed. *Wright Motors, Inc. v. Marathon Oil Co.*, 631 N.E.2d 923, 927 n.3 (Ind.Ct.App. 1994).

## DEFENDANT A. RAY TINNERMAN'S MOTION FOR SUMMARY JUDGMENT

I move now to the motion for summary judgment filed by ART — the last tenant in the property. Counts I and II are the environmental claims against ART under Indiana and federal law. AWC concedes that summary judgment is proper against it on those two claims. So summary judgment on Counts I and II will be granted to ART without further discussion. That leaves Count III, the claim for breach of the lease and Count IV, the claim under the common law tort of "waste."

### Count III Against ART – Breach of Lease

AWC claims that ART breached the lease by "failing to keep the building in good repair and working order, as well as [by] the release or discharge and continued presence of hazardous substances." [DE 76 at ¶46]. The elements of a breach of lease claim are "the existence of a contract, the defendant's breach of the contract, and damages." *Bobeck Real Estate Co., Inc. v. Frontier North Inc.*, ___ F.Supp.3d ___, 2015 WL 4612051 at *9, n.2 (N.D.Ind. 2015), citing *Indiana Bureau of Motor Vehicles v. Ash*, 895 N.E.2d 359, 365 (Ind.Ct.App. 2008).

ART contends that there can be no claim against it for breach of the lease because ART was not party to any written lease with AWC. ART cites Indiana's statute of frauds, prohibiting an action involving an agreement not to be performed within one year "unless the promise, contract, or agreement on which the action is based, or a memorandum or note describing the promise, contract, or agreement..., is in writing and signed by the party against whom the action is brought[.]" IC §32-21-1-1(b). The

lease extension AWC relies on from 2010 to 2014 exceeds three years, and "a lease for more than three years...falls within the statute of frauds, and must be signed and in writing in order to be binding." *Kusper v. Poll Farms, Inc.*, 649 F.Supp.2d 917, 920 (N.D.Ind. 2009), citing *Soroka v. Knott*, 168 N.E. 703, 705 (1929). So the last unexecuted lease extension is inoperable.

But, rewinding the clock a bit, AWC consented back in October 2009 to Tinnerman Palnut's assignment of the lease to ART. At that time, the lease was subject to an extension through April 30, 2010. So it appears that for at least six months from October 2009 through April 2010, ART *was* subject to a lease with AWC for the property. Neither of the parties has recognized this in the briefing. AWC's pleading of its claim for breach of the lease is sweeping enough to cover the period of time in which ART had (by assignment from Tinnerman Palnut) a written lease with AWC.

As relevant to the period after the last executed lease extension lapsed, AWC relies on the doctrine of part performance as an exception to the statute of frauds. The doctrine is based on the equitable principle that the statute of frauds should not shield a party who breaches an oral contract "where the other party has performed his part of the agreement to such an extent that repudiation of the contract would lead to an unjust or fraudulent result." *Kusper*, 649 F.Supp.2d at 920. Indiana courts have held that the part performance doctrine is available in the context of a lease of real property for more than three years. *Id*. at 921.

Although "what facts will be held to constitute such a part performance must, of necessity, vary in each individual case," the Indiana Court of Appeals has reviewed the caselaw and held that, at a minimum, the acts relied upon as constituting the part performance "must be clear and definite and unequivocal and they must be done clearly and exclusively under the contract relied upon and not under some other contract." *Sourbier v. Claman*, 200 N.E. 721, 725 (Ind.Ct.App. 1936). In *Sourbier*, part performance was adequate to avoid the statute of limitations and recover for the landlord's breach of an oral lease because the restaurant tenant, in reliance on the oral extension of the lease, had made substantial improvements to the premises. *Id.* at 723. AWC cites Indiana caselaw holding that the part performance doctrine applies where there is some combination of acts of performance including payment, possession and "lasting and valuable improvements." *Spring Hill Developers, Inc. v. Arthur*, 879 N.E.2d 1095, 1104 (Ind.Ct.App. 2008). AWC relies only on ART's occupancy of the property and the payment of rent, while acknowledging that it is "unknown" whether ART made any improvements. [DE 94 at 5-6.] This is weak support for AWC's position, particularly given other respects in which the terms of the lease were not adhered to, further discussed below.

ART resists application of the part performance doctrine, insisting that the doctrine requires a meeting of the minds as to the exact and complete terms of the lease agreement invoked, which did not occur between ART and AWC. [DE 96 at 2.] ART

cites a historical Seventh Circuit decision from 1895, applying Illinois law, which in turn

quotes a U.S. Supreme Court opinion from 1877:

> To take the case out of the statute upon the ground of part performance,
> the party making the attempt must show by clear and satisfactory proof
> the existence of the contract as laid in his pleading, and the act of part
> performance must be of the identical contract which he has in that manner
> set up and alleged. It is not enough that the act of part performance is
> evidence of some agreement, but it must be unequivocal and satisfactory
> evidence of the particular agreement charged in the bill or answer.

*Williams v. Morris*, 95 U.S. 444, 457 (1877), quoted in *Harman v. Harman*, 70 F. 894, 924

(7th Cir. 1895) (Jenkins, J. dissenting).

The undisputed facts here include that the lease extension was never executed by

ART, that after AWC briefly made efforts to get the extension signed it abandoned

them, and that ART left the property a year before the extension would have expired,

with no challenge by AWC or effort to collect rent through the term of the extension.

These facts are inconsistent with the parties' complete agreement to the terms of the

written lease as though extended. ART's payment of rent for the period of actual

occupancy, while refusing or failing to execute the lease extension, is instead consistent

with a month-to-month tenancy not subject to the specific terms of the earlier lease.

Under Indiana statutes, "A general tenancy in which the premises are occupied by the

express or constructive consent of the landlord is considered to be a tenancy from

month to month." I.C. §32-31-1-2. As to the period after the last lease extension expired

on April 30, 2010, I conclude as a matter of law on the undisputed facts that ART

occupied the property by a month-to-month tenancy, and not under the terms of the

previous written lease.   AWC therefore has no claim for breach of lease for that period of time.

ART further argues that it is entitled to summary judgment on AWC's claim for breach of the lease because, even after discovery, AWC lacks evidence of the property's condition in 2009 when ART assumed occupancy and so is unable to proffer evidence that ART failed to maintain the property's condition.  ART cites *Bobeck*, in which Judge Cherry of this court granted summary judgment to a tenant on a landlord's similar claim for breach because the landlord had not "produced any specific material evidence regarding the condition of the Premises [upon initial occupancy] or a change in the condition of the Premises."  *Bobeck Real Estate Co.*, 2015 WL 4612051 at *10.

But in this case, the Lease provides that "Tenant's taking possession of the Premises shall be conclusive evidence of receipt thereof in good order and repair."  [DE 48-3 at 2, §4.01(a).]  And at the time ART took possession of the property in 2009, it did so by an assignment of the existing lease, as consented to by AWC.  I would read the maintenance and surrender provisions in this case as similar to the lease in *Bobeck*, generally requiring the tenant "to maintain the premises in as good condition as when first occupied, except for ordinary wear or tear, and that upon surrender, [the landlord] was entitled to the return of the property in the same or similar condition as when it was first leased, except for ordinary wear or tear."  *Bobeck*, 2015 WL 4612051 at *8.  But there is no indication in *Bobeck* of the same sort of lease provision as present here, under which ART's taking possession provides "conclusive evidence" that the property was

then "in good order and repair." [DE 48-3 at 2, §4.01(a).] With this distinction, *Bobeck* does not carry the day for ART.

Nonetheless, for AWC to succeed on a claim for breach of the lease against ART, it would have to demonstrate that ART committed the breach while the lease was in effect, that is, in the six months between October 19, 2009 and the lapse of the final extension of the lease on April 30, 2010. AWC lacks evidence specific to that period of time. As a matter of law, AWC is unable to demonstrate a breach during the brief term of its lease with ART, because AWC is unable to offer evidence of conduct or occurrences during that time period as distinguished from the almost three years of ART's month-to-month tenancy that continued after the lease extension expired. Summary judgment in ART's favor will be granted on the breach of lease claim in Count III.

### Count IV Against ART – Waste

It's now on to Count IV, AWC's claim under the Indiana common law tort of waste. ART says that a claim for waste doesn't exist for landlords like AWC, as opposed to mortgagees, and further can't succeed because AWC has no evidence of a damaging act by ART, as required to recover for waste.

In support of its first argument, AWC entirely misreads the principal case on which it relies, *Beiger Heritage Corp. v. Kilbey*, 676 N.E.2d 784 (Ind.Ct.App. 1997). AWC argues that *Beiger* explains that "the only class of plaintiffs entitled to bring an action in waste" consists of mortgagees and vendors in land sale contracts, who have a security

interest in the property, and then only to the extent of that interest.  [DE 87 at 18.]

AWC's confusion stems from the particular (and peculiar) context of the *Beiger* case,

which involved a dispute between the seller and buyer of a library, where the seller

later bought the property back and claimed that the buyer had committed waste during

his ownership of the property.  Because during the buyer's ownership, he held the

property in fee simple, seller's retention of a few contractual rights (concerning

restoration of the library's facade and a right of first refusal as to any sale) was an

insufficient interest to support a claim for waste.  *Beiger*, 676 N.E.2d at 788.

The discussion in *Beiger* actually plainly supports application of the doctrine of

waste by a landlord against a tenant:

> The underlying rationale for the theory of waste is that one vested with a
> limited estate should be liable for damage to those interests in the land
> which are not encompassed within their limited estate.  If the holder does
> damage to something owned by another, an interest beyond the scope of
> the limited estate the holder enjoys, liability results.  Thus a life tenant or
> *tenant for years*, seized of an estate limited in both duration and incidents
> of ownership, is liable for damage which extends to more than the
> possessory interest, affecting the fee simple.

*Id*. at 788 (emphasis added).   AWC correctly points out ART's misreading, and further

supports the existence of a landlord's claim for waste under Indiana law by citation to

*Bitler Investment Venture II, LLC v. Marathon Petroleum Company LP*, 741 F.3d 832, 834 (7th

Cir. 2014), which involved leased properties in both Indiana and Michigan.  The

Seventh Circuit explained in *Bitler* that waste as "a common law doctrine of great

antiquity traditionally used to mediate the competing interests of life tenants and

remaindermen," which the court then applied to the commercial leases involved in the

parties' dispute. *Id*. at 836. In its reply ART appears to concede that its first argument against the waste claim is incorrect, and does not pursue it further.

ART next contends that even if Indiana does recognize a claim for waste by a landlord against a tenant, AWC's claim is doomed because it is unable to offer evidence of a particular act or acts by ART that damaged the property. ART cites the undisputed facts that AWC had not itself inspected the property since the mid-1990's and that an appraisal in 2001 – eight years prior to ART's occupancy – already reflected the somewhat deteriorated state of the property. [DE 87-13 at 6.]

Again I note the lease's presumption that, upon the tenant's "taking possession," the property was "in good order and repair." [DE 48-3 at 2, §4.01(a).] Each tenant that moved in subject to that lease took on the burden of that "conclusive evidence." [*Id*.] So based on the contract provision there is some evidence that the property was in good repair when ART took control of the property. And there appears to be no dispute as to the dilapidated condition of the property at the time ART moved out. The question a jury must sort through is whether the dilapidated condition of the property — i.e. the waste — occurred during ART's occupancy.

In sum, the ancient tort of waste is committed with the "destruction, misuse, alteration, or neglect of the premises by one lawfully in possession to the prejudice of an estate or interest therein of another." *Finley v. Chain*, 374 N.E.2d 67, 82 (Ind.Ct.App. 1978) (overruled on other grounds in *Morris v. Weigle*, 383 N.E.2d 341, 345 n.3 (Ind. 1978)). At this stage of the proceedings, ART, as the last tenant to occupy the damaged

property, has not demonstrated that it is entitled to judgment as a matter of law on AWC's claim of waste because when ART assumed the lease it did so with the understanding that the property was in "good order and repair." A jury will have to decide if that in fact was true.

<u>CONCLUSION</u>

The Elco defendants' motion for summary judgment will be granted as to all five counts. Defendant ART's motion for summary judgment will be granted in part, as to the environmental claims in Counts I and II, and the breach of lease claim in Count III. ART's motion will be denied in part, with respect to the waste claim in Count IV. Given AWC's lack of evidence concerning the conduct of its various tenants over the years, it is unable to establish its environmental claims or a breach of its lease against any of them. But the presumption of the lease that the property is in good order when a tenant first takes possession leaves open the possibility that the last tenant, ART, might be liable for waste, in light of the condition of the property at the end of ART's tenancy.

**ACCORDINGLY:**

Defendants Elco Industries, Inc., Elco Textron, Inc. and Elco Fastening Systems, LLC's Motion for Summary Judgment [DE 89] is GRANTED as to all five counts of the third amended complaint.

Defendant A. Raymond Tinnerman Manufacturing, Inc.'s Motion for Summary

Judgment [DE 86] is GRANTED IN PART as to Counts I, II and III, AND DENIED IN

PART as to Count IV, which remains pending.

**SO ORDERED**.

ENTERED:  February 19, 2016.


 /s/ Philip P. Simon
Philip P. Simon, Chief Judge